UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO.

**JOHN M. VIGNONE, JR.**                                        **13-10935**
                                                                SECTION A
DEBTOR                                                          CHAPTER 11

<u>**OPINION**</u>

## I.  FACTS

On July 7, 2005, John M. Vignone, Jr. ("Vignone") and Paul O. Chiriaco ("Chiriaco")
formed John Paul, L.L.C. ("Company") for the purpose of purchasing and renovating properties in
New Orleans for resale.[1]  The Company was owned equally between Vignone and Chiriaco.[2]  An
initial capital contribution of approximately $163,000.00 was made by each member.[3]  Although
Vignone and Chiriaco lived in other states, they traveled to New Orleans frequently to supervise the
renovation of the Company's properties.[4]

After their initial contribution, each member advanced money to the Company to defray the
costs of operation and renovation.[5]  At first, funds were advanced on a 50/50 basis into the
Company's checking account.[6]  In addition, the members used their personal credit cards to pay
Company expenses.[7]  Expenses paid by a member's personal credit card were repaid as soon as

---

[1]  Exhibit ("Exh.") 13, Articles of Organization of John Paul, LLC.

[2]  Trial Transcript ("T.T.") 8:19-23.

[3]  T.T. 10:16-23.

[4]  T.T. 12:8-25; 13:1-21.

[5]  T.T. 15:19-23.

[6]  T.T. 15:19-23.

[7]  T.T. 15:24-25; 16:1-3.

possible, while cash advances waited for repayment until the Company had sufficient funds.[8]

In 2006, the Company hired Ken Pontiff to file its tax returns.[9]  Soon thereafter, Mr. Pontiff's role was expanded to include a historical analysis of the Company's finances and management of its books and records on a going forward basis.[10]  Vignone provided Pontiff with bank statements and cancelled checks for the Company as well as his own personal bank statements, cancelled checks, and credit card statements.  Pontiff used these records to reconstruct the books of the Company from inception to date.[11]  Thereafter, Pontiff produced an accounting of the Company's activities on an annual basis and for trial he produced an accounting from August 4, 2005 through May 25, 2011.[12]

In 2005, in addition to the initial capital contribution of $163,000.00, Chiriaco advanced $11,900.00 and Vignone $61,446.72.[13]  In 2006, Vignone advanced $137,393.88 and received $63,451.64.  Chiriaco advanced $466.53 but received no withdrawals from the Company accounts.[14]

During 2007, Vignone advanced $222,000.00 and Chiriaco $83,404.05.  Chiriaco received

---

[8]  T.T. 16:3-7.

[9]  T.T. 124:2-3.

[10]  T.T. 124:5-21; 125:2-14.

[11]  T.T. 125:12-14; 126; 127:1-18.

[12]  *See* Exh. 15.

[13]  T.T. 36:4-16.

[14]  T.T. 37:12-18; 38:13-18.

2

$252.30 but Vignone did not receive any funds that year.[15]  In 2008, Vignone advanced $321,308.01 and was paid $42,400.00.  Chiriaco advanced $19,048.13 but was not paid any funds.[16]  In 2009, Vignone advanced $208,000.58 and received $43,000.00 in payments while Chiriaco advanced $44,497.02.[17]  No monies were advanced by Vignone in 2010, but Vignone received $229,500.00.  Chiriaco advanced $1,400.21 in 2010 but received nothing.[18]  In 2011, Vignone paid $10,000.00 into the Company, and received $63,000.00.[19]  Chiriaco received $50,000.00 from the Company but advanced nothing further.[20]

Starting in 2005, the Company purchased two properties located on Burgundy St., New Orleans, La.  The first building, located at 827 Burgundy, was purchased for $575,000.00, renovated at a cost of $125,000.00 and carried a mortgage of $440,000.00.  It was converted into five (5) condominiums which sold for a gross sales price of $800,000.00, netting a profit of $100,000.00 for the Company.[21]

Shortly after buying 827 Burgundy, the Company purchased 833 Burgundy for $510,000.00.

---

[15]  T.T. 46:16-20; 47:7-19.

[16]  T.T. 47:21-25; 48:1-23.

[17]  T.T. 49:1-5; 52:10-23.

[18]  T.T. 52:24-25; 53:1-12; Exh. 15, p. 39.

[19]  T.T. 53:19-23; 54:3-8.

[20]  T.T. 54:9-14; Exh. 15, p. 39.

[21]  Because the property was purchased with a down payment of $135,000.00 and all renovations were paid by the members, the sale netted the Company $360,000.00 in cash but only $100,000.00 of profit.

The purchase price was paid with a bank loan of $400,000.00 and cash of $110,000.00.[22] It was not renovated and eventually was returned to the bank by *dation en paiment* for a loss of $110,000.00.[23]

A third property located at 837 Burgundy was also purchased for $550,000.00 with a loan of $440,000.00 and a cash down payment of $110,000.00. Renovation of the property was started but not completed because Hurricane Katrina hit New Orleans shortly thereafter. It was sold 'as is' for $450,000.00, which repaid the loan and $10,000.00 in initial renovation costs, but resulted in a loss of equity in the amount of $110,000.00.[24]

The Company's next property was located at 829 Burgundy for $575,000.00 with a second mortgage on 833 Burgundy, first on 829 Burgundy and a cash down payment of $135,000.00. It was resold to pay off the debt for approximately $450,000.00, again resulting in a loss of the Company's down payment.[25]

Subsequently, the Company purchased 940 Elysian Fields Ave. and Moulin Rouge Corporation which operated a bar at 940 Elysian Fields for $550,000.00. It was purchased with a bank loan for $450,000.00 and an owner financed second for $165,000.00. The property was ultimately foreclosed upon and repaid only the first loan.[26]

In November 2010, Chiriaco, Vignone and Pontiff met to discuss the Company's finances.

---

[22] The initial capital contributions of $163,000.00 from each member funded the down payments on 827 and 833 Burgundy as well as the renovation costs on 827 Burgundy of $125,000.00.

[23] T.T. 22:2-14; 23:3-13.

[24] T.T. 20-21.

[25] T.T. 23:16-25; 24;

[26] T.T. 82:17-20; 83; 84:1-10.

4

During this meeting, the members reviewed the Company's financial transactions line by line from 2005 through September 2010.[27] Chiriaco objected to Vignone's charge against the Company of $64,425.33 in aggregate travel expenses incurred by Vignone because he, Chiriaco, had not requested similar reimbursement. The two (2) agreed that the $64,425.33 would be deducted from Vignone's loan account and added to his equity.[28] In addition, Chiriaco insisted that his equity account also be raised to balance it with Vignone's.[29] Chiriaco did not object to the characterization of any other advances by Vignone as loans, nor did he object to any of the repayments Vignone had received.[30]

On February 7, 2013, Dennis Tizzard ("Tizzard") was appointed as the Company's liquidator.[31] On March 14, 2013, Tizzard resigned and, on May 1, 2013, Fred L. Herman was appointed liquidator.[32] As of the trial date, the Company's balance sheet reflected loans owed to Chiriaco, Vignone, L&M Amusement, and costs of liquidation.[33]

On April 10, 2013, Vignone filed a voluntary petition for relief under chapter 11 of the

---

[27] TT 135:17-21; 146:3-25; 147:1-7.

[28] TT 146; 147:1-13; 150:3-6.

[29] TT 159:18-22.

[30] TT 82:1-5; 148:17-25; 149:1-23; 196:21-25.

[31] Pleading 177, Exh. 1.

[32] Pleading 177, Exh. 1.

[33] *See* Exh. 19.

Bankruptcy Code.[34]  The bar date for filing proofs of claim was set for October 31, 2013.[35]  On October 31, 2013, a proof of claim was filed on behalf of creditor John Chiriaco.  The basis of the claim was alleged unapproved withdrawals made by Vignone from the Company "in at least the amount of $321,000 ("Chiriaco Claim")."[36]

On March 7, 2014, Debtor filed an Objection[37] to the Chiriaco Claim, alleging that he was not indebted to John Chiriaco and had not made any withdrawals from any account of John Chiriaco. Although the Herman Claim had not yet been filed,  Debtor further alleged that "[t]he purported 'unapproved withdrawals from John Paul, LLC' were, in fact, repayment of loans and monies previously made and/or advanced by the [D]ebtor to John Paul, LLC . . . ."  Debtor also objected to the proof of claim on the basis that any amounts owed by the Debtor to the Company are "offset" by amounts which the Company owed to Debtor.  Debtor added that the proof of claim was deficient in that there were insufficient records attached to support the amount of the claim.[38]

Upon receiving the Debtor's Objection and on the same day it was filed, an amended proof

---

[34]  Pleading 1.

[35]  Pleading 103.

[36]  Pleading 177, Exh. 1.

[37]  Debtor's original objection (pleading 177), filed March 6, 2014, consisted of his certificate of service rather than his substantive objection.

[38]  Pleading 181, p. 3.

of claim was filed by Fred L. Herman ("Herman"), in his capacity as Liquidator of John Paul LLC, JP New Orleans, LLC, and Moulin Rouge, LLC.("Herman Claim")[39]  The Herman Claim was identical to the Chiriaco Claim except that it substituted Herman in his representative capacity as the claimant.[40]

On April 11, 2014, Vignone filed an Amended Objection[41] asserting that the Herman Claim was actually a new proof of claim rather than an amendment to the Chiriaco Claim because it was filed on behalf of a different creditor.  Vignone averred that this new proof of claim was filed four (4) months after the October 31, 2013 bar date, and was untimely.  Vignone also objected to the Herman Claim on the same grounds articulated against the Chiriaco Claim.[42]

Initially, the Court must determine if the Herman Claim was timely filed.  If so, it must next address whether the funds taken represent authorized loan repayments or unauthorized withdrawals.[43]  Should the Court decide that the funds were loan repayments, a secondary issue arises as to whether the payments are subject to nullification.  In contrast, if the withdrawals were unauthorized, then issue arises as to whether Vignone can offset the amounts owed against those he claims are owed to him by the Company.

## II. ANALYSIS

---

[39]  For reasons that are unclear, the Herman Claim was assigned two claim numbers, 13-2 and 15-1.  For purposes of this Opinion, Claim nos. 13-2 and 15-1 will collectively be referred to as the Herman Claim.

[40]  Pleading 195, Exh. 2.  Since the filing of the Herman Claim, Herman has stipulated that his claim is for $131,500.00 rather than the $321,000.00 set forth in his claim.

[41]  As two claim numbers were assigned to the amended proof of claim, Debtor filed two Objections, pleadings 205 and 206.  These identical Objections will collectively be referred to as the Amended Objection to the Herman Claim.

[42]  Pleadings 205 and 206.

[43]  The parties do not dispute that Vignone took funds from the Company.

### A. Timeliness

The Chiriaco Claim was timely. The Herman Claim changed the name of the creditor but in all other respects was identical to the Chiriaco Claim. "Amendments to timely creditor proofs of claim have been liberally permitted to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." *In re Kolstad*, 928 F.2d 171, 175 (5th Cir. ), *cert. denied*, 502 U.S. 958, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991) (quotation omitted). The issue to be resolved in determining whether an untimely amendment should be permitted is whether the opposing party will be prejudiced by the amendment. As the Fifth Circuit explained, "courts that authorize amendments must ensure that corrections or adjustments do not set forth wholly new grounds of liability." *Id.* (citation omitted). *See also In re Sambo's Restaurants, Inc.*, 754 F.2d 811, 816-17 (9th Cir. 1985) (amendments to proofs of claim should be freely given in the absence of prejudice, when the purpose of the amendment is to cure a defect in the original claim or describe the claim with greater particularity).

*In re Unioil, Inc.*, 962 F.2d 988, 990 (10th Cir. 1992), involved a situation in which the amendment to the proof of claim sought to change the name of the creditor. In all other respects, the proof of claim was unchanged. The Court determined that in the absence of a showing of prejudice, the amendment was properly permitted.

> Ordinarily, amendment of a proof of claim is freely permitted so long as the claim initially provided adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable. The court should not allow truly new claims to proceed under the guise of amendment. *United States v. Int'l Horizons, Inc. (In re Int'l Horizons, Inc.)*, 751 F.2d 1213, 1216-17 (11th Cir.1985); *see Wright v. Holm (In re Holm)*, 931 F.2d 620, 622-23 (9th Cir.1991). There is no dispute here that the original proof of claim was adequate in these respects and that its *content* was unaltered by the requested amendment. [Emphasis original.]

\*                    \*                    \*

8

Late-filed amendments to proofs of claim should be treated with liberality, as "[l]eave to amend in a straight bankruptcy proceeding is 'freely allowed where the purpose is to cure a defect in the claim as originally filed. . . . '" *LeaseAmerica Corp. v. Eckel*, 710 F.2d 1470, 1473 (10th Cir. 1983) (quoting *First Nat'l Bank v. Everhart (In re Commonwealth Corp.)*, 617 F.2d 415, 420 (5th Cir.1980)); *Fidelity & Deposit Co.* [*v. Fitzgerald (In re Midyett & May Constr. Co.)*], 272 F.2d [121,] 130 [10th Cir. 1959), *cert. denied*, 362 U.S. 919, 80 S.Ct. 669, 4 L.Ed.2d 738 (1960)] (court should liberally allow amendment of a proof of claim where anything in the record justifies such action). In light of Unioil's failure to demonstrate actual prejudice resulting from the requested amendment, which, as already noted, asserted the same substantive interest as the original proof of claim . . . we cannot say the bankruptcy court abused its discretion in allowing the [amendment]. *See LeaseAmerica*, 710 F.2d at 1474 (since amendment referred to same underlying interest and transaction set out in original pleading, no prejudice was shown and leave to amend was properly granted); *see also Sambo's Restaurants, Inc.*, 754 F.2d at 816-17 (where party opposing amendment of proof of claim fails to demonstrate actual prejudice resulting therefrom, amendment should be freely allowed).

*In re Unioil, Inc.*, 962 F.2d at 992-993.

There has been no showing that Vignone is prejudiced by the Herman Claim. The Chiriaco Claim listed 'John Chiriaco' as the creditor rather than *Paul* Chiriaco, as member filing on behalf of the Company. In response, Vignone alleged that "[t]he purported 'unapproved withdrawals from John Paul, LLC' were, in fact, repayment of loans and monies previously made and/or advanced by the [D]ebtor to John Paul, LLC . . . ." Vignone's Objection was made prior to the filing of the Herman Claim. It clearly indicates that Vignone was both aware of the claim being asserted and responded accordingly. The Herman Claim sought to correct the mistaken designation of Chiriaco as the claimant by amending it to insert Herman. Neither the claim nor the legal basis for the claim changed, however. As a result, unless Vignone provides proof that that the correction is prejudicial, the Herman Claim should be permitted. Vignone offered nothing to support his allegation of prejudice.

Because Vignone has failed to demonstrate prejudice as a result of the late filing of the

Herman Claim, the Court finds that the Herman Claim is an amendment to the Chiriaco Claim.

Therefore, its filing relates back to the filing date of the Chiriaco Claim or October 31, 2013 and is

timely.

### B.  Authorized Loans Repayments

Vignone testified that in July, 2005, after both he and Chiriaco made capital contributions

to the Company of approximately $163,000.00 each, the members agreed to loan money to the

Company on a fifty-fifty basis as needed.  Over time the members purchased items on behalf of the

Company or satisfied Company expenses by using their personal credit cards.  In addition, both

members made cash deposits into the Company account and paid for Company expenses with

personal funds.  Both members received sizable withdrawals from the Company accounts allegedly

to repay these items.

Herman alleges that the payments on personal credit cards, cash deposits into the Company

account and satisfaction of Company expenses with a member's personal funds are actually capital

contributions rather than loans.  Herman asserts that the contributions are not represented by a

writing, the terms of repayment were not detailed, and the advances were made because the

Company lacked sufficient capital to meet its obligations. As a result, withdrawals received by the

members were actually a return of capital and subject to recovery.

The record reflects that Vignone and Chiriaco each paid $163,000.00 to the Company in July

2005.  The payments were entered as capital contributions or equity on the Company's books.

Following these transactions the members incurred charges on their personal credit cards on behalf

of the Company and made additional cash payments from their personal funds to satisfy Company expenses. Beginning in 2005 the Company booked $11,900.00 and $61,446.72 in 'loans' by Chiriaco and Vignone respectively. In 2006 Vignone's loan account increased by $137,393.88 while Chiriaco's was only slightly higher. Vignone also received withdrawals of $63,451.64, slightly higher than his 2005 advances to the Company. The withdrawals were entered as repayments on the loans owed to Vignone on the Company books.

Vignone testified that he and Chiriaco agreed that advances made to the Company with their personal credit card loans would be reimbursed "immediate[ly]" while other loans would be made as necessary to the Company on a fifty-fifty basis. He also testified that the members agreed to repayment of the cash loans as the company made money and had funds available.[44]

The record reflects that by the end of 2006, the Company's loans payable account to Vignone had a balance of $135,388.96 while Chiriaco's account was only $12,366.53. Vignone testified that because Chiriaco could no longer contribute fifty percent (50%) toward the Company's expenses, the members agreed that any advances to the Company would be repaid on a last in, first out basis rather than equally.

From 2007 through 2010 both members advanced substantial sums to the Company. The record reflects that Chiriaco paid over $148,349.41 on behalf of or to the Company and Vignone $751,308.59. In each year, the advances were booked as loans on the Company's records. The Company's tax returns, financial statements, and accounting records substantiate this characterization.[45] To refute this evidence, Herman offered the testimony of Chiriaco. Chiriaco

---

[44] TT 15:19-25; 16:1-7.

[45] *See* Exh. 15, Exh. 19, Exh. 21, Exh. 23, Exh. 25, Exh. 27, Exh. 28 and Exh. 29.

11

testified that he never agreed to treat his or Vignone's advances on behalf of the Company as loans.
Instead, Chiriaco averred that they were always meant to be equity contributions. The amounts
advanced are not in dispute.[46] Thus dispute arises only as to whether the amounts were loans subject
to repayment or capital contributions.

The Company's records are consistent and clear. Long before internal disputes arose
between members, Vignone and Chiriaco shared equal access and responsibility for the Company's
accounting. When this proved too burdensome, the members hired Kenneth Pontiff ("Pontiff") to
keep the Company books. Pontiff, an accountant, testified that he met with both Vignone and
Chiriaco and in September, 2006, was hired to render accounting services for the Company.[47]
Pontiff personally reviewed the bank statements and cancelled checks associated with the
Company's operating and money market accounts. Pontiff testified that he also reviewed Vignone's
personal and business bank statements to track the monies going back and forth from Vignone's
personal and business accounts to the Company.[48] He testified that every advance made and
payment received was documented.

In connection with his work for the Company, Pontiff prepared a journal reflecting the
transactions associated with its accounts.[49] The journal reflects every deposit and withdrawal from

---

[46] The deposits and withdrawals associated with the Company operating account are set forth in Exhibit
15. The parties have stipulated that the transactions documented in Exhibit 15 are correct, *i.e.*, the amounts are
correct and the transactions took place.

[47] TT 124:2-11.

[48] TT 125:12-14.

[49] TT 126:1-17; *see* Exh. 15 and Exh. 16.

the Company.   Member deposits were characterized by Pontiff as loans rather than capital contributions.  Pontiff testified that although he was in contact with both members regularly, neither instructed him to capitalize their advances to the Company.  Further, each year he prepared financial statements and tax returns for the Company which clearly reflected the Company's continuing obligations to the members as loans payable.  Although he answered questions regarding other issues, neither member ever raised any question on this point.  Pontiff stated that there was never a discussion of capital contributions other than the initial contributions in 2005.  Subsequent deposits were always referred to as loans.[50]  This was true for monies advanced by both Chiriaco and Vignone.

In November 2010 Pontiff and Tracey Hanks[51] met with both members to discuss the Company's finances.  Pontiff prepared a historical account of every transaction from the Company's inception through September 2010 for the members to review.  The accounting contained every capital contribution and loan made to the Company by either member and any repayments received.  Pontiff testified that  he and the members went through the report "line by line."[52]  This testimony is corroborated by Vignone and Hanks.[53]

During the meeting, the members' loan accounts were particularly scrutinized.  Chiriaco objected to the inclusion of Vignone's travel expenses as an advance on the Company's behalf.  As a result, over $64,000.00 in Vignone's loan account balance was capitalized as an equity

---

[50]  TT 130:5-17.

[51]  Tracy Hanks ("Hanks") worked with Pontiff from 2008 to present and assisted him in the preparation of a journal reflecting the transactions associated with the Company.

[52]  TT 135:17-18; 146:21-23; 149:15.

[53]  TT 63:22-25; 195:13-25; p. 196:1-4.

contribution.[54]  Pontiff explained that at the meeting, he, Hanks, Chiriaco, and Vignone reviewed

the transactions of the Company in detail, even pulling the supporting documents for questioned

transactions.[55]  Chiriaco saw the withdrawals Vignone was making from the Company operating

account and he lodged no objection.[56]  Both Vignone and Pontiff testified that at the conclusion of

the meeting, the members were in agreement that all other transactions into and from their loan

accounts were proper.[57]  Vignone testified that if not for such an agreement, he would not have

continued to advance funds on the Company's behalf.[58]

    Pontiff also prepared the tax returns for the Company for the years 2005 to 2010.[59]  As a

result of the agreement that the travel expenses would not be reimbursed, the 2005, 2006, 2007 and

2008 tax returns had to be amended.[60]  Pontiff explained that the returns, specifically Vignone's

Schedule K-1 forms, had to be amended to designate Vignone's non-reimbursable travel expenses

as capital contributions for the years the expenses were incurred.[61]

---

[54]  TT 64:5-9; 146:12-13.

[55]  TT 135:17-21.

[56]  TT 148:17-24; 149:10-15.

[57]  TT 81:25; 82:1-8.

[58]  TT 82:9-14.

[59]  TT 150:14-18.

[60]  TT 155:3-5.  The 2009 and 2010 tax returns had not yet been prepared so no amendment was necessary.
TT 177:1-6.

[61]  TT 155:8-9; 156:1-2; 158:2-11; 159:12-22; 170:13-24.  Exhibit 18 lists Vignone's non-reimbursable
travel expenses.  Broken down into years, Vignone spent $6537.01 on travel in 2005; $16,477.38 in 2006;
$12,396.29 in 2007; $15,101.11 in 2008; and $13,913.54 in 2009, for a total of $64,425.33.  Herman claims that
Vignone owes the Company this amount.  (Pleading 265, p. 11).  However, Herman has failed to make any showing
that Vignone was, in fact, reimbursed for his travel expenses.  Vignone testified that he was not paid for his travel
expenses.  (TT 50:16-22).  This point is reiterated in Vignone's post-trial memorandum (pleading 267, p. 16), which
provides that none of his listed loan amounts and loan repayment amounts include "the travel expenses paid by

14

At trial, Hanks confirmed that she attended the November, 2010 meeting.  She also remembered Chiriaco's objection to Vignone claiming reimbursement for his travel expenses. Hanks corroborated Pontiff's testimony that other than the travel expenses, Chiriaco had no problem with any other reimbursements Vignone received from the Company nor did he object to the characterization of any other amounts advanced by Vignone as loans.[62]

Chiriaco testified that in 2005, both he and Vignone made capital contributions to the Company in the amount of approximately $163,000.00.[63]  Thereafter, based upon the Company's need for additional funding, both Chiriaco and Vignone deposited money into the Company operating account.[64]  Chiriaco testified that it was his recollection that their payments would be considered capital contributions, not loans.[65]  Chiriaco testified that he "never received money back for loans."[66]

Despite his testimony that he believed the deposits were not loans, Chiriaco admitted that he was reimbursed for some amounts that he paid to the Company.[67]  On September 7, 2006, Chiriaco wrote himself a check for $19,122.10, specifying that it was repayment for a "John Paul

---

Vignone that were re-classified as 'non-reimbursable' by agreement of the members of the Company."

[62]  TT 196:21-25.

[63]  TT 203:18-21.

[64]  TT 204:4-8.

[65]  TT 205:1-2.

[66]  TT 209:2-3.

[67]  TT 219:12-22.

Loan."[68]    He also acknowledged receipt of $50,000.00 in 2011 as a repayment on his advances.[69]

Although he had no independent recollection of his deposits into and withdrawals from the operating account,[70] Chiriaco acknowledged that the transactional journal chronicling the debits and credits of the Company operating account, the accuracy of which is uncontested, reflects that in 2005 he made deposits totaling $11,900 to the Company.[71]  While Chiriaco knew he had advanced funds to the Company in that year, he claimed no knowledge as to how the Company treated his advance. However, Chiriaco did admit that the K-1 form he received that year showed no change in the balance of his capital account from the original $163,000.00 he paid in.[72]

A similar discrepancy exists when comparing the Company's 2006 transactional account entries with the Company's 2006 tax return.  The transaction journal reflects that both Vignone and Chiriaco deposited funds into the Company's operating account.[73]  Chiriaco admitted that such transfers took place.

---

[68]  *See* Exh. 35.

[69]  TT 281:20; 283:19-23; 284:1-17.  *See* Exh. 38.  John Vignone offered testimony to the effect that Chiriaco received loan repayments in the amount of $50,000 in 2011.  TT 54:12-14.  Vignone also acknowledged that he received $60,000 in loan repayments that same year.  TT 55:8-17.  *See* Exh. 31 (last page).

[70]  TT 235:9-18; 236:16-23; 237:20-24.

[71]  Chiriaco's testimony in this regard was based upon his review of Exhibit 15, p. 39, which reflects his deposit of $6,000.00 on 7/21/05; his deposit of $3,400.00 on 8/19/05; and his deposit of $2,500.00 on 11/8/05.  *See* TT 231:10-22; 236:16-23.

[72]  *See* Exh. 20, 2005 Tax Return for the Company, Schedule K-1 for Paul O. Chiriaco, Section N.

[73]  *See* Exh. 15, pp. 39, 40, 42.

> Q.  Okay.  And you knew in 2006 that both you and Mr. Vignone were paying bills and expenses for John Paul, LLC so it [could] continue its operations, is that correct?
> A.  That's correct.[74]

However, the 2006 tax return does not reflect any additional capital contributions by Chiriaco to the Company.[75]  When confronted with the Company's returns and his K-1, Chiriaco questioned whether he had ever seen the return, explaining that it "was probably given to John and I probably haven't seen it."[76]  However, when confronted with the return and receipt for mailing he had to admit that not only had he signed the return, but also mailed it to the IRS.[77]

For the year 2007, both Chiriaco and Vignone deposited funds into the Company's operating account.[78]  Again, these deposits are not reflected as capital contributions on the company's tax return.[79]  Again, Chiriaco was presented with the Company return *that he signed and mailed* reflecting no change in his capital account despite his advances.[80]

In 2008, Chiriaco transferred funds into the Company.[81]  Again, the 2008 tax return reflects

---

[74]  TT 250:13-16.

[75]  *See* Exh. 23, Schedule K-1 for Paul O. Chiriaco, Section N.

[76]  TT 247:6-19

[77]  TT 251:14-16.  *See* Exh. 39.

[78]  *See* Exh. 15, pp. 39, 40-45, 47.

[79]  *See* Exh. 25.  Chiriaco's K-1 reflects a capital contribution of approximately $15,000.  This amount is not what he actually contributed but rather is a "plug number" or equity equalization amount insisted upon by Chiriaco.  *See* discussion p. 5, *supra*.  Vignone's K-1 reflects a capital contribution of approximately $28,000.  This amount represents a $15,000 plug number plus approximately $12,000 which represents Vignone's non-reimbursable travel expenses.  TT 163:4-8, 12-20.

[80]  *See* Exh. 40.

[81]  *See* Exh. 15, p. 39.

that Chiriaco made no capital contributions to the Company in 2008.[82] Similarly, Vignone deposited monies into the operating account,[83] but the only capital contribution is $15,102 which represents the amount of his non-reimbursable travel expenses.[84]

For 2009 the transactional journal reflects that Chiriaco made several deposits into the Company's operating account.[85] However, the company's 2009 tax return shows that Chiriaco made no capital contributions to the company.[86] Similarly, Vignone made numerous deposits,[87] but the only capital contribution is for $13,913, his non-reimbursable travel expenses.[88]

Based upon the above, the Court finds that Vignone and Chiriaco verbally agreed that with the exception of Vignone's travel expenses, all deposits into the Company's operating account, following the two initial capital contributions, represented loans subject to repayment. The only evidence contrary to the Court's finding in this regard is Chiriaco's recollection that the deposits were to be treated as capital contributions. However, based upon his memory impairment and inconsistent testimony, the Court lends no credence to Chiriaco's testimony.

Chiriaco testified that he suffered "a brain bleed" for a period of nine months, undergoing brain surgery in February, 2011. Following the surgery, Chiriaco remained hospitalized for "a

---

[82] *See* Exh. 27, 2008 Amended Tax Return for the Company, Schedule K-1 for Paul O. Chiriaco, Section L.

[83] *See* Exh. 15, pp. 43, 45 and 47.

[84] *See* Exh. 27, 2008 Amended Tax Return for the Company, Schedule K-1 for John M. Vignone, Section L.

[85] *See* Exh. 15, p. 39.

[86] *See* Exh. 28, 2009 Tax Return for the Company, Schedule K-1 for Paul O. Chiriaco, Section L.

[87] *See* Exh. 15, pp. 43, 45-47.

[88] *See* Exh. 28, 2009 Tax Return for the Company, Schedule K-1 for John M. Vignone, Section L.

couple of months" and underwent a significant period of rehabilitation.[89]  As a result, Chiriaco could

not remember the November, 2010 meeting which took place in Pontiff's office, a lengthy meeting

in which the parties painstakingly went through the company's transactions "line by line" and agreed

that the deposits would be treated as loans and the withdrawals would be treated as loan

repayments.[90]  With respect to his lack of memory in this regard, the following colloquy ensued:

> Q. Mr. Chiriaco, you attended a meeting with both Mr. Vignone and Ken Pontiff in
> November 2010 at which you, Mr. Pontiff, and Mr. Vignone reviewed the
> transactions . . . .
> A. I don't recall.  That's an area where I had heavy bleeding on the brain.  I don't
> recall that at all.
> Q. Okay.  You don't recall the meeting at all?
> A. No, I lost about six months of memory prior to the surgery.[91]

Chiriaco also could not remember whether he received copies of the Company's tax returns.

Chiriaco originally testified that he "never saw any of the returns before they were filed."[92]  Later,

when confronted with the fact that he had signed and mailed the 2006, 2007 and 2009 returns,[93]

Chiriaco admitted that he was mistaken, that his earlier testimony was "not true."

> Q. [Y]ou also testified today when you first took the stand that you had never seen
> these returns before they were filed, that you had never . . . been given copies of
> them in advance, that you hadn't done anything with them, you were maybe given
> them after they were filed, and that's not true either.
> A. That is correct.  That is not true.  I did sign them and send them off.  That is my
> signature.
> Q. Okay, so I take it that you had a difficultly [sic] remembering the accurate facts?

---

[89]  TT 210:6-11; 282:16-17.

[90]  TT 222:11-22; 223:13-16; 295:15-19.

[91]  TT 222:11-22.

[92]  TT 238:18.

[93]  TT 248:14-20; 250:4-16; 258:6-11; 259:8-22; 277:12-25; 278:1-13.  *See also* Exh. 30, Exh. 39, Exh. 40
and Exh. 41.

A.  That is a hundred percent correct because this has been very convoluted.[94]

Having determined that the company members verbally agreed that the deposits into the

Company operating account were loans, rather than capital contributions, the question arises as to

whether the parties had the legal authority to enter into such an agreement.

### C.  Unauthorized Withdrawals

Herman argues that Vignone, under the Company's Articles of Organization, did not have

the authority to reimburse himself for funds advanced to the Company.  In support of his argument,

Herman points to Article V of the Articles of Organization which provides:

> **Unless and until these Articles of Organization are amended to provide otherwise, the company shall have no operating agreement and all questions concerning its status and operations**, including questions of management and management rights, finance, distributions, assignment of membership interests and dissolution **shall, unless otherwise provided herein, be governed by the laws of the State of Louisiana and particularly Title 12, Section 1301 *et. seq.* of the Revised Statutes of Louisiana** [emphasis added].[95]

Herman next directs the Court to La. R.S. 12:1316 which provides:

> Except as otherwise provided in the articles of organization or an operating agreement, if the limited liability company has more than one manager, each manager shall be entitled to a single vote on all matters properly brought before the managers, and **all decisions of the managers shall be made by majority vote of the managers** [emphasis added].

Thereafter, Herman relies on La. R.S. 12:1309 which makes clear that any amendment to the

articles of organization must be in writing.[96]  Thus, the argument is that there could be no "verbal

---

[94]  TT 274:24-25; 275:1-10.

[95]  *See* Exh. 13.

[96]  La. R.S. 12:1309 provides, in pertinent part:
A.  The articles of organization shall be amended when . . .
(3) The members desire to make a change . . . in order to accurately represent their agreement.

amendment to the articles of organization" and, as such, Vignone was bound by the original provisions of Article V which provide that the company will be governed by the laws of Louisiana, specifically, La. R.S. 12:1316 which directs that all decisions "shall be made by a majority vote of the managers." Accordingly, "[t]he repayment of loans or capital to Mr. Vignone required the consent of both managers [i.e. Vignone and Chiriaco], which was not obtained."[97]

The above argument is without merit because of ample evidence attesting to the agreement by both managers. With the exception of travel expenses and the initial two capital contributions, both Vignone and Chiriaco agreed that all funds expended on behalf of the Company would be treated as loans subject to repayment.[98]

### D.  Nullification of Loan Repayments

La. C.C. art. 2036 provides that:  "An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that

---

B.  After an amendment has been adopted as provided by this Chapter, articles of amendment setting forth the amendment, the date, and manner of adoption thereof shall be executed in the limited liability company's name by a manager of the limited liability company . . . .  The articles of amendment shall be acknowledged by at least one of the persons who signed them or may be executed by authentic act.

C.  The articles of amendment shall be filed with the secretary of state . . . .  [T]he secretary of state shall record the articles of amendment in his office and endorse thereon the date and, if requested, the hour of the filing thereof with him.  Thereupon the amendment shall be effective as of the date and, if endorsed on the articles of amendment, the hour of filing.

[97]  Pleading 265, p. 5.

[98]  As the funds deposited into the Company's operating account were loans rather than capital contributions, the corresponding reimbursements were loan repayments rather than distributions subject to the restrictions enunciated in La. R.S. 12:1327(A) which the liquidator suggests should be applied in this case. (Pleading 265, pp. 7-8).  Similarly, the liquidator's attempt to hold the members' agreement that the deposits were to be treated as loans to the scrutiny afforded to such decisions in a corporate setting is inappropriate.  (Pleading 265, pp. 6-7).  The enunciated factors for determining whether amounts advanced to a corporation are loans or capital contributions are simply not applicable to a two-member limited liability company such as the Company.

causes or increases the obligor's insolvency." Thus, for an obligee to annul an act of the obligor he must show: "(1) an act (or failure to act) of the obligor that causes or increases the obligor's insolvency; and (2) the act must occur after the obligee's rights arose.[99]

In this case, Vignone's action did not increase the Company's insolvency. His authorized withdrawals represented payments of prior debts, specifically, Vignone's earlier loans to the Company.[100]

As an alternative argument, Vignone asserts that any claim by the Company, *via* its liquidator Herman, for revocation of the loan repayments has prescribed. La. C.C. art. 2041 provides, in pertinent part:

> The action of the obligee must be brought within one year from the time he learned or should have learned of the act, or the result of the failure to act, of the obligor that the obligee seeks to annul, but never after three years from the date of that act or result.

Herman was appointed liquidator of the Company on May 1, 2013.[101] Pursuant to the appointment, Herman was provided access to the Company's bank records, business records and financial records.[102] Accordingly, Vignone argues that Herman knew or should have known of Vignone's actions on May 1, 2013 or shortly thereafter yet "no revocatory action has been filed to

---

[99] *Parish Nat. Bank v. Wilks*, 923 So.2d 8, 15 (La. App. 1ˢᵗ Cir. 2005) (citation omitted). *See also Forterra Capital, LLC v. Mamal, Inc.*, 55 So.3d 963, 966 (La. App. 4ᵗʰ Cir. 2011).

[100] *See In re Gulf Fleet Holdings, LLC*, 491 B.R. 747, 766-767 (Bkrtcy. W.D. La. Apr. 2, 2013) (payments in satisfaction of an antecedent debt does not increase insolvency).

[101] Pleading 177, Exh. 1, Amended and Re-Stated Order from Judge Lloyd J. Medley, Jr of the Civil District Court for the Parish of Orleans, State of Louisiana.

[102] *See* paragraphs 7 and 9 of the Amended and Re-Stated Order.

date much less than within one year after their having legal access to all records of that company which would have or did put them on notice of the loan repayments to Vignone."[103]

As noted earlier, Vignone filed for bankruptcy on April 10, 2013.  Vignone's action in this regard precluded Herman or anyone else from filing a revocatory action seeking to nullify Vignone's loan repayments.[104]  Vignone's argument of prescription is without merit.

### E.  Setoff/Compensation

Section 553 of the Bankruptcy Code provides that a creditor may setoff a mutual debt owing between itself and the debtor despite the filing for bankruptcy relief.  Section 553, however, "does not create any setoff right; it merely preserves certain rights of setoff that exist under applicable nonbankruptcy law."[105]  In this case, the right to setoff arises under state law, specifically, Louisiana's doctrine of judicial compensation.[106]

Under Louisiana law, compensation takes place by operation of law when two persons owe each other sums of money that are liquidated and presently due.  In such a case, compensation

---

[103]  Pleading 267, p. 47.

[104]  *See* 11 U.S.C. § 362(a).

[105]  Collier on Bankruptcy ¶ 553.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18-19, 116 S.Ct. 286, 289, 133 L.Ed.2d 258, 262 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.").

[106]  *See In re MAC-JGC Marketing, Inc.*, 277 Fed. Appx. 355, 2008 WL 1924220, *1 (5th Cir. 2008) (applying Louisiana's compensation law in context of Louisiana bankruptcy proceeding); *In re Delta Entergy Resources, Inc.*, 67 B.R. 8, 10 (Bkrtcy. W.D. La. Apr. 24, 1986) (determining as a threshold matter that right of compensation exists under Louisiana law); *Wiley v. Public Investors Life Insurance Company*, 498 F.2d 101, 103 (5th Cir. 1974) (recognizing that Louisiana state law determines property rights of the bankrupt); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141-42 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

extinguishes both obligations to the extent of the lesser amount.[107]

In this case, there is no mutual debt owing between the creditor and the debtor. As stated earlier, the Court finds that the withdrawals made by Vignone were authorized loan repayments. Vignone owes no sum of money to the Company.

## III. CONCLUSION

Based upon the above, the Court finds that with the exception of the initial capital contributions of approximately $163,000.00 each and Vignone's capital contribution of $64,425.33, representing his non-reimbursable travel expenses, the funds deposited by Vignone and Chiriaco into the Company's operating account were loans subject to repayment. As such, the Court sustains

Vignone's Objections and disallows both the Chiriaco and Herman Claims in full.

A judgment in accord with this Opinion will be separately rendered.

New Orleans, Louisiana, November 10, 2014.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[107] La.C.C.art.1893.